374 So.2d 626 (1979)
PROFESSIONAL COMPUTER MANAGEMENT, INC., a Florida Corporation, Appellant,
v.
TAMPA WHOLESALE LIQUOR CO., INC., a Corporation, Appellee.
No. 78-1595.
District Court of Appeal of Florida, Second District.
August 15, 1979.
*627 Claude H. Tison, Jr. and John R. Bush of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellant.
Ralph C. Dell of Allen, Dell, Frank & Trinkle, Tampa, for appellee.
HOBSON, Judge.
Professional Computer Management, Inc. (PCM) appeals from a final judgment entered on a directed verdict in a jury trial and also from a final cost judgment.
PCM contends that the trial court erred in directing a verdict for appellee Tampa Wholesale Liquor Co. (TWL) when the evidence raised factual questions which should have been submitted to the jury. We agree with appellant's argument and reverse the final judgment in favor of TWL.
In March, 1971, the parties entered into a five-year service contract whereby PCM was to provide various accounting services to TWL. The information was generated from documents prepared by TWL employees.[1] The TWL account occupied a major portion of PCM's service capacity and indeed TWL provided leased office space on its premises for PCM's operation.
The contract provided that after the five-year term ending January 31, 1976, either party could terminate by written notice between 90 and 120 days before the end of the term. If neither party gave termination notice, the contract renewed itself for successive one-year periods until terminated. The contract further provided that in the event of termination by TWL, other than for nonperformance by PCM, TWL would pay $3,000 per month remaining in the term.
An additional paragraph stated that the contract could be terminated by either party "for failure of the other to comply with any of its terms, including failure to perform by PCM, which TWL deems unwarranted." In that event the terminating party "shall have no further liability to the other party to make payment hereunder ... [or] to perform the services required hereunder... ."
Over the period of the contract, which was renewed for one-year terms in February 1976 and February 1977, the volume of business handled by PCM on behalf of TWL increased substantially. In April, 1975, TWL requested that PCM acquire a second IBM computer that could be made available to TWL's staff for data processing, independent of the services being performed by PCM under the contract. PCM leased a second computer and billed TWL for one-half of the rental price from July 1975 until contract termination in 1977. TWL regularly paid $750 per month.
Subsequently, increased business needs from TWL and other clients resulted in PCM's need for a larger, more sophisticated computer, which was scheduled for delivery in March 1977 from Sperry Univac. In November, 1976, TWL began negotiations with Sperry Univac and eventually placed an order for a large computer in January, 1977. This computer was identical to the one ordered by PCM. Consequently, PCM cancelled its order with Sperry Univac for the new computer and terminated its lease on the second IBM computer at a cost of $7,117.24.
In March, 1977, PCM entered into an agreement with TWL to continue renting office space and to rent computer time on TWL's new computer during the evening hours. During this time, TWL found it necessary to run certain tests on its new computer which required the use of key-punch cards previously prepared by PCM. TWL requested the use of these cards and PCM later billed TWL $1,760.64. TWL declined to pay this bill, claiming that the key-punch cards were to be scrapped by PCM in any event and that TWL had already paid for all of the key-punching. *628 PCM claimed that there was an agreement for payment, an allegation denied by TWL.
On May 11, 1977, TWL informed PCM that the service contract would be terminated effective May 26, 1977 "under the provisions of paragraph X of the Agreement for the failure to perform by PCM which Tampa Wholesale Liquor Co., Inc., deems unwarranted."
PCM filed a complaint alleging that TWL had terminated the contract outside the notice period and without cause, thus becoming liable for liquidated damages. PCM further alleged that TWL was in breach of its agreement to pay half the lease cost of the second IBM computer installed at TWL's request. PCM also claimed the unpaid bill of $1,760.64 for the key-punch cards used to test TWL's new computer. The complaint further prayed for injunctive relief to restrain TWL from evicting PCM from its rented office space.
At the jury trial, PCM presented evidence showing that over a period of six years only six to eight errors had been shown which could be traced to PCM employees.[2] Many of the errors or late reports were attributable to TWL employees who either entered incorrect numbers on the handwritten documents or did not deliver the documents to PCM in time for the information to be processed. The record shows that the conversion of information from TWL's manually prepared forms to punch cards over a period of six years exceeded six million key strokes.
TWL's vice president of operations was called by PCM as an adverse witness and testified that PCM's services had been unsatisfactory from the beginning. When asked to identify any specific defaults by PCM in its contract obligations over the period of the contract, he furnished a compilation of eight occasions between January 1st and March 31st, 1977, when PCM had provided a report later than it should have. (One of the incidents involved a report that was eight minutes late.) He admitted that it was possible that the problem was the result of errors committed by TWL employees.
PCM entered into evidence a letter from the president of TWL dated September 5, 1974 and addressed to a business firm considering the use of PCM's computer services. TWL's president stated in the letter that his association with PCM had been "extremely satisfactory." He reported that under the PCM service contract "our data processing costs have been reduced by 30% and more important, our level of efficiency has greatly increased ... through PCM's in-depth involvement with Tampa Wholesale Liquor and their accessibility as an onsite system. They have from the onset remained trustworthy, reliable, and very responsive to our every request."
At the close of PCM's case, TWL moved for a directed verdict. The trial court granted the directed verdict and entered a final judgment in favor of TWL. The court further awarded costs of $755.48 to TWL. PCM questions the propriety of this award.
In view of the fact that this case comes to us on a judgment from a directed verdict rendered at the close of appellant's case, we must view the evidence in a light most favorable to appellant. As our supreme court stated in Teare v. Local Union No. 295, 98 So.2d 79, 81 (Fla. 1957):
In order to support a verdict directed by the trial judge at the close of the plaintiff's evidence it should be clear that there is no evidence whatsoever that could in law support a verdict for the plaintiff. (citations omitted)
If there is any evidence in the record to support a verdict for appellant, the entry of the directed verdict is improper. Baro v. Southeast First Nat. Bank, etc., 363 So.2d 397 (Fla.3d DCA 1978).
*629 It is clear that there were factual questions in this case which should have gone to the jury. Testimony showed that although there were mistakes made in PCM's reports to TWL, the number of errors was small compared to the millions of separate computer items processed. The problems were often attributable to TWL's employees who either submitted their reports late or entered illegible figures. A jury should determine whether or not PCM breached the contract by failure to perform and if there was a failure to perform, was it reasonably deemed unwarranted by TWL.
Moreover, the question of the agreement to split the rental cost of the second IBM computer must be considered. PCM presented uncontradicted testimony that the agreement was made between the parties and that for two years TWL paid half the rental cost. This question should have been presented to the jury for a factual determination as should the issue of the key-punch cards.
Another issue presented for our consideration concerns the awarding of costs to appellee for certain expenses incurred by appellee's attorney. The trial judge allowed to TWL, as taxable costs, $630.48 for travel expenses, $45 for long distance telephone calls, and $75 for copying expenses. These expenses were incurred in order to obtain the deposition of a former PCM employee who had moved to New York. TWL did not introduce the deposition into evidence at trial although a page of the deposition was read into evidence by PCM.
Taxable costs do not, absent special provisions of contract or statute, include personal expenses of counsel in obtaining depositions for trial. Dorner v. Red Top Cab & Baggage, 37 So.2d 160 (Fla. 1948). In a case with similar facts, the First District Court of Appeal disallowed expenses in obtaining hospital records, a copy of a deposition and transportation to attend the deposition. That court stated:
The hospital records were not admitted into evidence and no necessity was demonstrated. The copy of the deposition was neither entered into evidence nor used at the trial for impeachment nor otherwise (citation omitted). Neither was the taxation of counsel's expenses for traveling to Virginia for the purpose of deposition proper.
Aetna Life Insurance Co. v. Sievert, 361 So.2d 747, 748 (Fla. 1st DCA 1948).
Because of our reversal of the final judgment in this cause, this issue is moot; however, we feel constrained to comment on the award of taxable costs because costs will be taxed after final judgment.
For the reasons stated, we hereby reverse the final judgment entered in favor of Tampa Wholesale Liquor, Inc. and the cost judgment and remand this cause for a new trial.
REVERSED and REMANDED.
GRIMES, C.J., and DANAHY, J., concur.
NOTES
[1] TWL employees filled out order forms each day showing the exact quantity of each product sold. PCM used these figures to make up "picking lists." These lists were to be prepared by 8 p.m. each evening so that TWL trucks could be loaded for the next day deliveries. In addition, PCM provided accounts receivable, weekly "House Sales" reports which included salesmen's commissions and discounts.
[2] PCM's key-punch supervisor testified that she maintained a file of invoices on which errors had been called to her attention by TWL. After a period of six years the file contained reports of four key-punch errors. The supervisor noted that she always requested TWL to send her copies of invoices on which errors appeared in order to verify them, but in most instances TWL did not respond.